NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

PAINO MANUEL ALVAREZ-PERDOMO,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12060
Trial Court No. 3AN-12-8080 CR

O P I N I O N

No. 2604 — June 22, 2018

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Marjorie A. Mock, Anchorage, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Paino Manuel Alvarez-Perdomo was convicted of first-degree assault for shooting his mother in the side, and also third-degree weapons misconduct for being a felon in possession of a concealable firearm.

Alvarez-Perdomo appeals his convictions, arguing that the trial judge forced him to testify at his trial, thus violating his constitutional right not to be compelled to incriminate himself. We agree that the trial judge committed error by forcing Alvarez-Perdomo to take the stand when he never clearly stated that he wished to testify. However, we conclude that, given the facts of Alvarez-Perdomo's case, this error was harmless beyond a reasonable doubt, and we therefore affirm Alvarez-Perdomo's convictions.

*Underlying facts*

On the afternoon of August 8, 2012, Alvarez-Perdomo called his mother, Altagracia Guillen, and asked if she would come over to his apartment. When Guillen arrived, Alvarez-Perdomo answered the door, but he remained inside the apartment and Guillen remained outside the door. According to Guillen's later testimony, Alvarez-Perdomo was holding his right hand behind his back, and "his eyes looked sad". Guillen thought that something was not quite right, and she decided not to enter the apartment.

Guillen then heard a loud noise, as if a weapon of some kind had been fired. She later told the police and medical personnel that she felt something hit her in the abdomen, although she did not immediately feel any pain. Guillen then started running away from her son's apartment, through a parking lot. As Guillen was running through the parking lot, she heard another gunshot. She finally reached a nearby restaurant, where she stopped to seek help and to call her daughter. By this time, Guillen was bleeding profusely, and an ambulance was summoned.

The police soon responded to the scene, and they could see that Guillen was wounded and bleeding. When Guillen was asked what happened, she replied that her son had just shot her.

A later medical examination revealed that Guillen had suffered a through-and-through gunshot wound to her lower abdomen. She was lucky: somehow the bullet had passed through her body without hitting any major organs.

The police went to Alvarez-Perdomo's apartment, and Alvarez-Perdomo surrendered to the police without incident. As soon as the police entered the apartment, they could smell the odor of a recently fired gun, and they found a revolver in Alvarez-Perdomo's bedroom. This revolver contained five cartridges — two of which had been fired.

Based on this evidence, Alvarez-Perdomo was convicted of first-degree assault (for shooting his mother) and third-degree weapons misconduct (for being a felon in possession of a concealable firearm).

The issue presented in this appeal arose toward the end of Alvarez-Perdomo's trial, when his attorney announced that he did not intend to present a defense case. Under the rule established in *LaVigne v. State*,[1] the defense attorney's announcement triggered the trial judge's obligation to question Alvarez-Perdomo personally — to make sure that Alvarez-Perdomo understood that he had the right to testify at his trial, and that the decision whether to testify lay solely with him, regardless of his defense attorney's wishes.

This *LaVigne* inquiry began with the trial judge explaining (actually, re-explaining) that Alvarez-Perdomo had the right to testify or the right to remain silent, and that this was Alvarez-Perdomo's personal decision. But when the judge asked Alvarez-

---

[1]   812 P.2d 217 (Alaska 1991).

Perdomo whether he had decided to remain silent, Alvarez-Perdomo did not offer a definite answer:

> *The Court*: Mr. Alvarez-Perdomo, you might remember that, at the beginning of the trial, I talked to you about the issue of whether you would or would not testify. And ... I want to emphasize again that, by talking to you about your decision, I don't mean to suggest that I think you should do one thing or another. I just need to make sure, once again, that you understand what your rights are in this area.
>
> As I told you before, this jury has been instructed that ... you have an absolute right to remain silent. And if you choose to remain silent, the jury may not discuss that matter. They can't hold it against you or consider it in any way. And your attorney ... has advised me that you have chosen to not testify. Is that correct?
>
> *Alvarez-Perdomo*: I think so.
>
> *The Court*: All right. Do you *know* so?
>
> *Alvarez-Perdomo*: I don't know.
>
> *The Court*: All right. [To the defense attorney] You need some more time to talk to him?
>
> *Defense Attorney*: Apparently, Your Honor. If I could have a few moments.

When court reconvened, Alvarez-Perdomo's defense attorney informed the judge that he had counseled Alvarez-Perdomo to refrain from testifying, since it appeared that there was nothing to be gained through his testimony. However, the defense

attorney also informed the judge that Alvarez-Perdomo "resent[ed] the fact" that the defense attorney kept telling him that this decision was up to him (*i.e.*, up to Alvarez-Perdomo). Apparently, Alvarez-Perdomo believed that it was part of the defense attorney's duty (as his legal representative) to make this decision for him.

When the judge asked Alvarez-Perdomo whether he needed still more time to discuss this matter with his attorney, Alvarez-Perdomo gave a rambling, non-responsive answer:

> *Alvarez-Perdomo*: I don't know. No, because the paperwork — they have been giving me the documents, [and] I do not understand them. They are — they just say I am guilty, I am guilty. And I don't know why they want to — they want to make me guilty about strange things.

At this point, the judge called another recess so that Alvarez-Perdomo could again confer with his attorney.

When court reconvened, the defense attorney apprised the judge of his renewed conversation with his client:

> *Defense Attorney*: Your Honor, I've spoken with Mr. Alvarez-Perdomo, and ... I indicated my advice was not to testify. He indicated he agreed with that advice. [But] I think I understand his position: he's frustrated that I keep asking him the same question, and that I'm not protecting him in [the] courtroom, and just [keep] putting him on the spot with the judge. I don't know if the Court's obligation [under *LaVigne*] can be satisfied on my representation, but he has indicated to me that he accepts my advice not to testify. And I think, because he has an absolute right not to testify, even though we can't stop him from testifying if he'd like to, [that] unless he [affirmatively] indicates right now that he wants to testify, or that I'm misrepresenting [his position],

I think that we're legally sound to proceed without his testimony.

After hearing the defense attorney's explanation, the judge repeatedly asked Alvarez-Perdomo if it was correct (1) that he had spoken with his attorney, and (2) that his attorney had advised him not to testify. Alvarez-Perdomo would not answer the judge's questions.

When the judge pressed Alvarez-Perdomo for an answer, Alvarez-Perdomo eventually said that he remembered speaking to his attorney, but that he did not remember what they had talked about. Alvarez-Perdomo then commenced a long monologue about the conditions at the jail.

When Alvarez-Perdomo finished, the judge again directed his attention to the matter of whether he would testify at his trial:

> *The Court*: [Your attorney] has told you he does not think you should testify, correct?
>
> *Alvarez-Perdomo*: Yes, that is what he has been telling me.
>
> *The Court*: Do you want to accept this advice?
>
> *Alvarez-Perdomo*: No.
>
> *The Court*: So do you want to testify?
>
> *Alvarez-Perdomo*: It seems so. I don't know. I am not a lawyer.

At this point, the judge said, "All right," and he then directed a judicial services officer to escort Alvarez-Perdomo to the witness stand.

After Alvarez-Perdomo was seated in the witness stand, the judge and Alvarez-Perdomo had the following conversation:

*The Court*: Mr. Alvarez-Perdomo, are you ready to testify to the jury?

*Alvarez-Perdomo*: Is the Court asking me?

*The Court*: Yes.

*Alvarez-Perdomo*: No.

*The Court*: Are you ready to testify to the jury?

*Alvarez-Perdomo*: Are we ready?

*The Court*: When the jury comes in. Okay.

*Alvarez-Perdomo*: Let's go. Let's go.

*The Court*: We'll bring the jury panel in.

*Alvarez-Perdomo*: I don't know have your time. [*sic*]

*The Court*: I'm sorry?

*Alvarez-Perdomo*: I don't know have your time. [*sic*]

*The Court*: I don't understand.

*Alvarez-Perdomo*: I do not speak English. Let's keep going because I'm getting cold.

*The Court*: All right.

At this point, the defense attorney interjected that he was worried about what the judge was doing, because Alvarez-Perdomo's initial answer to the question, "Are you ready to testify?" was "No". Based on that initial answer, the defense attorney expressed concern that Alvarez-Perdomo was, in fact, not willing to testify. The judge responded, "I didn't sense that."

The judge then addressed Alvarez-Perdomo, explaining the procedures that would be followed when the jury was summoned back to the courtroom: "You're going to stand, raise your right hand, and be sworn by Madam Clerk. ... And then you're going to have a seat, [and your attorney] will ask you questions." When the judge asked Alvarez-Perdomo if he understood, Alvarez-Perdomo answered, "Okay, that's fine."

The jury was then brought back to the courtroom, and Alvarez-Perdomo gave his testimony. His direct examination was fairly brief, and his cross-examination was even briefer. Here are the relevant questions and answers:

> *Defense Attorney*: [Mr. Alvarez], where'd you live on August 8th, 2012?
>
> *Alvarez-Perdomo*: In Alaska.
>
> *Defense Attorney*: Okay. Did you live at 615 West 45th?
>
> *Alvarez-Perdomo*: Anchorage.
>
> *Defense Attorney*: Okay. So 615 West 45th in Anchorage. Is that fair to say?
>
> *Alvarez-Perdomo*: I don't know.
>
> *Defense Attorney*: Okay. Is your mother Altagracia Guillen?

*Alvarez-Perdomo*:  I don't know.

*Defense Attorney*:  Did you see Ms. Guillen — well, do you know who Ms. Guillen is?

*Alvarez-Perdomo*:  No.

*Defense Attorney*:  Well, then, I think this is probably pretty easy.  Did you shoot Altagracia Guillen on August 8th, 2012?

*Alvarez-Perdomo*: I am not — the thing is, I am not an assassin.  I am not an assassin. I am not, you know, this kind of guy.  I don't know how to say it in Spanish.  [*sic*: "English"]

*Defense Attorney*:  Do you want to try saying it in English?

*Alvarez-Perdomo*:  I do not speak English.

*Defense Attorney*:  Okay.

*Alvarez-Perdomo*:  I am Dominican.

*Defense Attorney*:  Okay; all right.  Thank you, Mr. Alvarez.

*The Court*:  [to the prosecutor] Cross-examination.

*Prosecutor*:  Good morning, sir.  Why did you shoot your mom?

[Defense attorney's objection overruled]

*Alvarez-Perdomo*:  I don't know what is it that you are asking me.  I don't know.  He's saying Altagracia Guillen, and what is it that you want to ask me?

*Prosecutor*: Okay.  You see your mother here in court, right?  Why did you shoot her?

[Defense attorney's objection overruled]

*Alvarez-Perdomo*:  I do not know that lady.

*Prosecutor*:  Okay. Thank you. I have no further questions.

Following deliberations, the jury found Alvarez-Perdomo guilty of both first-degree assault (recklessly causing serious physical injury to another person by means of a dangerous instrument) and third-degree weapons misconduct (felon in possession of a concealable firearm). [2]

*The trial judge committed error when he had Alvarez-Perdomo take the stand and testify*

In *LaVigne v. State*, [3] the Alaska Supreme Court established the procedural rule that, whenever the attorney representing a criminal defendant announces that the defense intends to rest without presenting the defendant's testimony, the trial judge must personally address the defendant to make sure the defendant understands (1) that they have the right to testify, and (2) that the decision whether to testify rests solely with the defendant, regardless of their defense attorney's advice or wishes.

---

[2]  AS 11.41.200(a)(1) and AS 11.61.200(a)(1), respectively.

[3]  812 P.2d 217, 219, 222 (Alaska 1991).

*LaVigne* was a case where the defendant told his attorney that he wanted to testify on his own behalf, but the defense attorney unilaterally decided that LaVigne should not testify, without informing LaVigne that he had a right to insist on testifying despite his counsel's advice.[4] The *LaVigne* rule is designed to ensure that a defense attorney does not "effectively waive a defendant's right to testify against the defendant's will." *Id.*, 812 P.2d at 219.

But the *LaVigne* rule does not require a trial judge to obtain the defendant's affirmative waiver of the right to testify. Rather, the crucial aspect of the *LaVigne* inquiry is simply to make sure that the defendant *understands* that they have a legal right to testify and that they can assert this right regardless of what their attorney wants them to do.[5]

As subsequent cases have shown, there are occasionally times when a defendant will refuse to give a direct or unequivocal answer when the judge asks the defendant whether they wish to testify. In such circumstances, the *LaVigne* rule requires only that the judge fully inform the defendant of their right to testify. If the defendant then refuses to explicitly waive their right to testify, the trial judge cannot order the defendant to take the stand.[6] Rather, the judge should order the trial to proceed without the defendant's testimony.[7]

---

[4]   *LaVigne*, 812 P.2d at 218.

[5]   *Tall v. State*, 25 P.3d 704, 708-09 (Alaska App. 2001); *Mute v. State*, 954 P.2d 1384, 1386 (Alaska App. 1998).

[6]   *Knix v. State*, 922 P.2d 913, 918-19 (Alaska App. 1996).

[7]   *Wyatt v. State*, 393 P.3d 442, 446 (Alaska App. 2017); *Zemljich v. Anchorage*, 151 P.3d 471, 478 (Alaska App. 2006); *Knix v. State*, 922 P.2d at 919.

In the present case, the record shows that Alvarez-Perdomo was having obvious cognitive difficulties — both in understanding the law that the judge and his defense attorney were trying to explain to him, and in deciding whether to testify.

Some of Alvarez-Perdomo's statements, taken in isolation, appear to support the trial judge's conclusion that Alvarez-Perdomo wanted to testify. But we cannot take Alvarez-Perdomo's statements in isolation. Every one of those statements was accompanied by other statements that either directly contradicted the notion that Alvarez-Perdomo wanted to testify, or at least placed that notion in doubt.

The State argues that even if Alvarez-Perdomo's statements are ambiguous or equivocal, the question of whether Alvarez-Perdomo subjectively wanted to testify is a question of fact — and that, when we review the judge's finding on this issue of fact, we must construe the record in the light most favorable to the judge's finding, and we must affirm that finding unless it is clearly erroneous. [8]

But the rule to be drawn from our prior cases interpreting *LaVigne* is that, when a judge asks a defendant whether they wish to testify and the defendant offers only equivocal responses, a judge must order the trial to proceed without the defendant's testimony, rather than risking the prospect of forcing a defendant to testify. [9] In other words, a defendant must clearly state their desire to testify before a judge directs them to take the stand.

Thus, the question here is not whether the trial judge was potentially correct when he concluded that Alvarez-Perdomo wanted to testify. Rather, the question is whether the trial judge was correct when he concluded that Alvarez-Perdomo had *clearly*

---

[8]   *See Booth v. State*, 251 P.3d 369, 373 (Alaska App. 2011) (explaining that a trial court's findings of historical fact are reviewed under the "clearly erroneous" standard of review).

[9]   *See Knix v. State*, 922 P.2d 913, 918-19 (Alaska App. 1996).

expressed his desire to testify, by retracting or otherwise clarifying his earlier equivocal statements regarding this matter. And the answer to that question is "no".

We therefore conclude that the trial judge committed constitutional error when he directed the judicial services officer to escort Alvarez-Perdomo to the stand, and when he then summoned the jury to hear Alvarez-Perdomo's testimony.

The remaining question is whether this error requires reversal of Alvarez-Perdomo's convictions.

For the reasons we are about to explain, we conclude that this constitutional error is amenable to a harmless error analysis, using the "harmless beyond a reasonable doubt" test adopted in *Chapman v. California* [10] and *Love v. State*. [11]

*This error is amenable to a harmless error analysis*

In his brief, Alvarez-Perdomo argues that if he was improperly brought to the stand and asked to testify, this error should be deemed "structural" — that is, it should automatically require reversal of his convictions, without any consideration of whether the error might be harmless beyond a reasonable doubt.

There are few cases that address this issue directly, because the error itself is so infrequent. But there are at least three published cases which deal with instances where a judge coerced or improperly influenced a defendant to testify. In these cases, the appellate courts held that the error was not structural; rather, it was a constitutional error that required reversal of the lower court's judgement unless the error was shown to be harmless beyond a reasonable doubt. *See United States v. Goodwin*, 770 F.2d 631,

---

[10]   386 U.S. 18, 23-24; 87 S.Ct. 824, 827-28; 17 L.Ed.2d 705 (1967).

[11]   457 P.2d 622, 631 (Alaska 1969).

636-38 (7th Cir. 1985); *People v. Cuccia*, 118 Cal.Rptr.2d 668, 673 (Cal. App. 2002); *People v. Watkins*, 634 N.W.2d 370, 378-79 (Mich. App. 2001).

(For unpublished decisions reaching this same conclusion, *see City of Shawnee v. Valle*, 2012 WL 2620549 at *5 (Kan. App. 2012); *State v. Carter*, 2004 WL 5582079 at *2 (Vt. 2004); *State v. Spooner*, 1997 WL 344834 at *5 (Wash. App. 1997).)

We conclude that this "harmless beyond a reasonable doubt" analysis is the proper approach to Alvarez-Perdomo's case.

The classification of an error as "structural" is designed for instances where a constitutional error affects the criminal adjudication process at such a fundamental level that it is essentially impossible for an appellate court to assess the ways in which the error might have affected the outcome — circumstances where an appellate court cannot meaningfully apply the "harmless beyond a reasonable doubt" rule that normally attaches to constitutional error.

But in Alvarez-Perdomo's case, we know what the State's evidence was, and we know what Alvarez-Perdomo's testimony was. Because of this, Alvarez-Perdomo's case is analogous to cases where the government improperly introduces a defendant's involuntary confession or a defendant's statements taken in violation of *Miranda v. Arizona*.[12] In such cases, appellate courts will reverse the defendant's conviction unless the error is shown to be harmless beyond a reasonable doubt.[13]

We apply the same harmless error analysis to Alvarez-Perdomo's case. The question is whether the admission of Alvarez-Perdomo's testimony was harmless beyond

---

[12] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[13] *See Kalmakoff v. State*, 257 P.3d 108, 130 (Alaska 2011), and *Motta v. State*, 911 P.2d 34, 39-40 (Alaska App. 1996) (statements taken in violation of *Miranda*); *Jones v. State*, 65 P.3d 903, 909 (Alaska App. 2003), and *Cole v. State*, 923 P.2d 820, 832 n. 20 (Alaska App. 1996) (involuntary confession or involuntary incriminating statements).

a reasonable doubt — or, phrased another way, we ask whether there is a reasonable possibility that the jury might have returned a different verdict on the charges of first-degree assault and third-degree weapons misconduct (*i.e.*, felon in possession of a concealable firearm) if Alvarez-Perdomo had not given his testimony. [14]

*Why we conclude that the error in Alvarez-Perdomo's case is harmless beyond a reasonable doubt*

In both the defense opening statement and the defense summation to the jury, Alvarez-Perdomo's attorney conceded that Alvarez-Perdomo shot his mother. But the defense attorney argued that the shooting was accidental, and that Alvarez-Perdomo was not guilty of first-degree assault because he acted only negligently, not "recklessly" (or intentionally) as required by the first-degree assault statute, and because the resulting injury to Alvarez-Perdomo's mother was not sufficiently serious to qualify as a "serious physical injury".

On the other hand, the defense attorney offered no defense to the weapons misconduct charge (felon in possession of a handgun). The defense attorney conceded that Alvarez-Perdomo shot his mother with the revolver that the police found in his residence, and the attorney did not dispute that Alvarez-Perdomo was a convicted felon.

Thus, with regard to the weapons misconduct conviction, we have no difficulty in concluding that the trial judge's error in forcing Alvarez-Perdomo to take the stand was harmless beyond a reasonable doubt.

We also agree with the State that the error in having Alvarez-Perdomo testify was harmless beyond a reasonable doubt with respect to the question of whether Guillen's wound constituted a "serious physical injury".

---

[14] *Anderson v. State*, 337 P.3d 534, 540 (Alaska App. 2014).

The issue is closer with respect to the jury's conclusion that Alvarez-Perdomo acted with the recklessness required for first-degree assault. As we just explained, the defense theory of the case was that the shooting was purely accidental, and that Alvarez-Perdomo acted only negligently — *i.e.*, that he did not subjectively perceive and consciously disregard the risk to his mother. [15]

We acknowledge that Alvarez-Perdomo's testimony could conceivably have made a difference to the jury's assessment of Alvarez-Perdomo's mental state when he shot his mother. Although Alvarez-Perdomo declared on the stand that he was no "assassin", he did not offer the jury an exculpatory explanation of the events that led to the wounding of his mother. Instead, Alvarez-Perdomo declared that he did not know his mother, and he stated that he did not recognize Guillen as she sat in the courtroom.

Based on this testimony, the jurors might reasonably have concluded either that Alvarez-Perdomo was lying or that he was seriously mentally ill. Either conclusion might conceivably have affected the jurors' discussion of the defense claim that the shooting was purely an accident.

But the question is not whether the content of the jurors' deliberations might have been different if Alvarez-Perdomo had not given this testimony. Rather, the question is whether there is a reasonable possibility that the *outcome* of the jury's deliberations would have been different. [16]

On this question, we agree with the State that, even without Alvarez-Perdomo's testimony, the evidence was overwhelming that Alvarez-Perdomo acted at least recklessly when he shot his mother. When Guillen arrived at the apartment and

---

[15] See the definition of "recklessly", AS 11.81.900(a)(3).

[16] *Cunningham v. State*, 408 P.3d 1238, 1246 (Alaska App. 2017); *Anderson v. State*, 337 P.3d 534, 538, 540 (Alaska App. 2014).

looked at her son through the open door, she saw that he was concealing his right hand behind his back. Because Guillen felt that something was wrong, she decided not to enter her son's apartment. As soon as she started to leave, she felt the bullet strike her in the abdomen.

Although Guillen did not actually see her son bring his hand around to the front of his body, the only reasonable explanation is that Alvarez-Perdomo was holding a gun behind his back, and that he brought his hand forward and shot his mother. And after Alvarez-Perdomo wounded his mother, he did not try to help her. Instead, as Guillen ran away across the parking lot, Alvarez-Perdomo fired another shot.

Given these facts, we conclude that even if the trial judge had not called Alvarez-Perdomo to the witness stand, there is no reasonable possibility that the jury would have reached a different verdict on the first-degree assault charge.

This is not to say that we condone what happened here. Having a trial judge force a reluctant or indecisive defendant to take the stand is inconsistent with the Fifth Amendment and the basic principles of our adversary system of justice.

As we have repeatedly explained, when a trial judge conducts a *LaVigne* inquiry, the judge's duty is to make sure that the defendant is *apprised* that he or she has the ultimate authority to decide whether to take the stand, regardless of what the defense attorney may desire or advise. Once this information has been imparted to the defendant, the judge's duty is fulfilled. If the defendant is then unwilling or unable to make an unequivocal decision to testify, the trial should go forward without the defendant's testimony. [17]

---

[17] *Wyatt v. State*, 393 P.3d 442, 446 (Alaska App. 2017); *Tall v. State*, 25 P.3d 704, 709 (Alaska App. 2001); *Mute v. State*, 954 P.2d 1384, 1388 (Alaska App. 1998); *Knix v. State*, 922 P.2d 913, 918-19 (Alaska App. 1996).

In such circumstances, a judge must not badger or coerce a defendant to take the stand. That is what happened in this case, and it was constitutional error.

*Conclusion*

Although the trial judge committed constitutional error by coercing Alvarez-Perdomo to take the stand, we conclude that this error was harmless beyond a reasonable doubt, given the other evidence in this case. That is, we conclude that there is no reasonable possibility that this error altered the jury's verdict. The judgement of the superior court is therefore AFFIRMED.