*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PAINO MANUEL ALVAREZ-PERDOMO, | ) ) ) | Supreme Court No. S-17170 |
| Petitioner, | ) ) | Court of Appeals No. A-12060 |
| v. | ) ) | Superior Court No. 3AN-12-08080 CR |
| STATE OF ALASKA, | ) ) | O P I N I O N |
| Respondent. | ) ) ) | No. 7424 – December 27, 2019 |

Petition for Hearing from the Court of Appeals, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Margi A. Mock, Anchorage, for Petitioner. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Respondent.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I.    INTRODUCTION

The court of appeals determined that Paino Manuel Alvarez-Perdomo was coerced to take the stand at his criminal trial. The court concluded that being coerced to take the stand violated Alvarez-Perdomo's privilege against self-incrimination,

guaranteed by the state and federal constitutions. But the court of appeals held that this error was not a structural error requiring reversal, and that this error was harmless beyond a reasonable doubt.

We granted this petition for hearing to decide an issue of first impression: whether the violation of a criminal defendant's right not to take the stand is a structural error. We conclude that compelling a criminal defendant to take the stand is a structural error because it implicates personal interests more fundamental than the ordinary risk of a wrongful conviction. We therefore reverse the court of appeals' decision regarding harmless error, reverse the judgment of conviction, and remand to the superior court for a new trial.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In August 2012 Alvarez-Perdomo called his mother, Altagracia Guillen, and asked her to come to his apartment. When Alvarez-Perdomo opened the door to his apartment, Guillen noticed that he had his right hand behind his back and that his "eyes looked sad." Concerned by this, she decided not to enter the apartment. She heard a loud noise, which she thought was the firing of either a gun or a BB gun. She began running and heard a second shot. Guillen ran to the parking lot of a nearby restaurant and called her daughter to tell her that she was wounded.

Guillen's daughter called the police, who arrived quickly with an ambulance. At the hospital an emergency-room doctor determined that Guillen had a gunshot wound in the abdomen, but that the bullet had not damaged any organs, arteries, or veins.

Meanwhile, police officers went to Alvarez-Perdomo's apartment and took him into custody. When officers searched his apartment, they smelled the odor of a

discharged firearm and eventually found a revolver, from which two shots had been fired. The officers also found a bullet hole in a nearby building facing his apartment.

## B.    Proceedings

### 1.    The superior court

A grand jury indicted Alvarez-Perdomo on one count of first-degree assault and one count of third-degree weapons misconduct for being a felon in possession of a concealable firearm.[1]  Because the State needed to present Alvarez-Perdomo's prior felony conviction as evidence to prove the weapons misconduct charge, the superior court bifurcated the trial to avoid prejudicing the first-degree assault deliberations. Thus the trial on the assault charge was completed before the jury was presented with the weapons misconduct charge.  An interpreter was provided for Alvarez-Perdomo, who speaks Spanish.

At trial on the assault charge, the State presented testimony of Guillen, police officers who responded to the incident, the investigating detective, the doctor who treated Guillen at the hospital, and one of Alvarez-Perdomo's neighbors, who recalled hearing an argument coming from his apartment immediately before the shooting. According to the first police detective to arrive at the restaurant and speak with Guillen, she told the detective that her son had shot her.  At trial, however, Guillen testified that

---

[1]    *See* AS 11.41.200(a)(1) (recklessly causing serious physical injury to another with dangerous instrument); AS 11.61.200(a)(1) (knowingly possessing concealable firearm as a felon).  Alvarez-Perdomo was also indicted for first-degree attempted murder, but the prosecutor dismissed that charge. *See* AS 11.31.100 (engaging in conduct constituting substantial step toward commission of crime, with intent to commit crime); AS 11.41.100 (intentionally causing death of another).

she did not recall making any such statement to the police, and in fact was still uncertain about "whether it was with a BB gun or . . . with a handgun."

After the presentation of the State's case, Alvarez-Perdomo's attorney told the court that he would not be calling any witnesses. In an attempt to apply the rule we established in *LaVigne v. State*, the court then sought to personally confirm with Alvarez-Perdomo that he intended to waive his right to testify.[2] Alvarez-Perdomo's answers to the court's questions were equivocal:

> *The Court*: And your attorney, . . . has advised me that you have chosen not to testify. Is that correct?
>
> *Alvarez-Perdomo*: I think so.
>
> *The Court*: Do you know so?
>
> *Alvarez-Perdomo*: I don't know.

After these equivocal answers, the court recessed so Alvarez-Perdomo could consult with his attorney. Upon returning from the recess, Alvarez-Perdomo's attorney explained that Alvarez-Perdomo had acknowledged and agreed with the decision not to take the stand, but he resented that he had to discuss the decision with the court when he considered communications with the court to be the responsibility of his attorney.

The court then returned to questioning Alvarez-Perdomo, whose response was agitated and confused:

> *The Court*: Mr. Alvarez, do you think you've had enough time to talk to your attorney about this decision?

---

[2]   Defendant LaVigne wanted to testify, but his attorney advised against it. *LaVigne v. State*, 812 P.2d 217, 218 (Alaska 1991). Without informing LaVigne that he had the right to testify regardless of his legal advice, LaVigne's attorney unilaterally decided that he would not testify. *Id.* To avoid future cases of an attorney usurping the defendant's right to testify, we instructed "that trial judges should take steps to insure that a criminal defendant's failure to take the stand in his or her own defense was the result of a knowing and voluntary decision made by the defendant." *Id.* at 222.

. . .

> *Alvarez-Perdomo*: I don't know, no, because the paperwork — they have been giving me the documents; I do not understand them. They are — they just say I am guilty, I am guilty, and I don't know why they want to — they want to make me guilty about strange things.

At this point the court received the permission of the prosecutor to continue the *LaVigne* inquiry in a private session with just Alvarez-Perdomo, his attorney, and his interpreter. Alvarez-Perdomo continued to give equivocal answers, and he often provided responses that were unrelated to the questions asked. Finally, the court gave Alvarez-Perdomo another opportunity to speak with his attorney before making a final decision whether he would testify.

After the second recess, Alvarez-Perdomo's attorney reiterated his client's frustration at being "put[] . . . on the spot" in court and his acceptance of the legal advice not to take the stand. The attorney suggested that Alvarez-Perdomo should not be further questioned about his decision not to testify "unless he indicates right now that he wants to testify or that I'm misrepresenting him." The court sought to confirm that Alvarez-Perdomo understood, but his responses were increasingly confused:

> *The Court*: Do you understand? Sí or no. Do you understand at this moment [your attorney's] advice is that he does not think you should testify?
>
> *Alvarez-Perdomo*: And so how is that? If I said yes, sí, so that means that I will testify. And if I say no, that —
>
> *The Court*: No, no, that's not my question. Listen. Do you understand that his advice is he does not think you should testify? I'm not asking you to decide. Do you understand that's what his advice is?
>
> *Alvarez-Perdomo*: No.
>
> *The Court*: What don't you understand?

*Alvarez-Perdomo*:  The word no.

*The Court*:  He has told you he does not think you should testify, correct?

*Alvarez-Perdomo*:  Yes, that is what he was — he has been telling me.

*The Court*:  All right.  Do you want to accept his advice?

*Alvarez-Perdomo*:  No.

*The Court*:  All right.  So do you want to testify?

*Alvarez-Perdomo*:  It seems so.  I don't know.

*The Court*: You — excuse me?

*Alvarez-Perdomo*: I am not a lawyer.

At the end of this exchange the court directed a judicial services officer to escort Alvarez-Perdomo to the stand.

The prosecution was invited back into the courtroom, and before calling in the jury, the court once again questioned Alvarez-Perdomo:

*The Court*: Mr. Alvarez-Perdomo, are you ready to testify to the jury?

*Alvarez-Perdomo*:  Is the court asking me?

*The Court*:  Yes.

*Alvarez-Perdomo*:  No.

*The Court*:  Are you ready to testify to the jury?

*Alvarez-Perdomo*:  Are we ready?

*The Court*:  When the jury comes in.  Okay.

*Alvarez-Perdomo*:  Let's go.  Let's go.

*The Court*:  We'll bring the jury panel in.

*Alvarez-Perdomo*:  I don't know have your time [sic].

*The Court*:  I'm sorry?

*Alvarez-Perdomo*:  I don't know have your time [sic].

*The Court*:  I don't understand.

*Alvarez-Perdomo*:  I do not speak English.  Let's keep going because I'm getting cold.

*The Court*:  All right.

Alvarez-Perdomo's attorney interjected, noting that Alvarez-Perdomo had stated that he did not wish to testify.  The judge responded:  "I didn't sense that."  The jury was called back into the courtroom.

On direct examination Alvarez-Perdomo claimed that he did not know basic information, such as his address or his mother's name:

*Defense Counsel*:  Okay.  Paino, where'd you live on August 8th, 2012?

*Alvarez-Perdomo*:  In Alaska.

*Defense Counsel*:  Okay.  Did you live at 615 West 45th?

*Alvarez-Perdomo*:  Anchorage.

*Defense Counsel*:  Okay.  So 615 West 45th in Anchorage. Is that fair to say?

*Alvarez-Perdomo*:  I don't know.

*Defense Counsel*:  Okay.  Is your mother Altagracia Guillen?

*Alvarez-Perdomo*:  I don't know.

*Defense Counsel*:  Did you see Ms. Guillen — well, do you know who Ms. Guillen is?

*Alvarez-Perdomo*:  No.

*Defense Counsel*:  Okay.  Well, then I think this is probably pretty easy.  Did you shoot Altagracia Guillen on August 8th, 2012?

*Alvarez-Perdomo*:  I am not — the thing is I am not an assassin.  I am not an assassin.  I am not, you know, this kind

of guy.  I don't know how to say it in Spanish.

*Defense Counsel*:  Do you want to try saying it in English?

*Alvarez-Perdomo*:  I do not speak English.

*Defense Counsel*:  Okay.

*Alvarez-Perdomo*:  I am Dominican.

During a brief cross-examination, Alvarez-Perdomo again indicated that he neither knew his mother's name nor recognized her.  Alvarez-Perdomo's attorney did not present any further witnesses or evidence.

During closing arguments on the assault charge, Alvarez-Perdomo's attorney asked the jury to conclude that Alvarez-Perdomo had not acted recklessly when he shot his mother.  His attorney argued instead that Alvarez-Perdomo had been criminally negligent and asked the jury to return a verdict on the lesser-included offense of fourth-degree assault.[3]  The jury found Alvarez-Perdomo guilty of first-degree assault. The jury was then presented with the weapons misconduct charge and found him guilty of third-degree weapons misconduct.

## 2.    The court of appeals

Alvarez-Perdomo appealed his convictions to the court of appeals.[4]  He argued "that the trial judge forced him to testify at his trial, thus violating his constitutional right not to be compelled to incriminate himself."[5]  The court of appeals

---

[3]     *See* AS 11.41.230.

[4]     *Alvarez-Perdomo v. State*, 425 P.3d 221, 222 (Alaska App. 2018).

[5]     *Id.*

concluded that the superior court committed constitutional error by compelling Alvarez-Perdomo to take the stand.[6]

The court of appeals began by explaining that during the superior court's *LaVigne* inquiry it inappropriately pressured Alvarez-Perdomo to explicitly waive his right to testify, rather than ensuring that he understood (1) that he had the right to testify, and (2) that he could make the decision to testify, regardless of the advice or wishes of his attorney.[7] The court of appeals stated that the superior court misunderstood *LaVigne* to require a definitive statement from Alvarez-Perdomo that he did not want to exercise his right to testify.[8] This misunderstanding resulted in the superior court "badger[ing]" him to take the stand.[9]

The court of appeals determined that although a few isolated comments by Alvarez-Perdomo indicated that he wanted to take the stand, the entirety of his equivocal responses to the *LaVigne* inquiry placed "the notion that Alvarez-Perdomo wanted to testify . . . in doubt."[10] And case law from the court of appeals firmly establishes that when a defendant is "unwilling or unable to make an unequivocal decision to testify, the trial should go forward without the defendant's testimony."[11] Thus, the superior court committed constitutional error "when [it] directed the judicial services officer to escort

---

[6]     *Id.* at 226.

[7]     *Id.*

[8]     *Id.* at 226-29.

[9]     *Id.* at 228-29.

[10]     *Id.* at 226.

[11]     *Id.* at 229 (citing *Wyatt v. State*, 393 P.3d 442, 446 (Alaska App. 2017); *Tall v. State*, 25 P.3d 704, 709 (Alaska App. 2001); *Mute v. State*, 954 P.2d 1384, 1388 (Alaska App. 1998); *Knix v. State*, 922 P.2d 913, 918-19 (Alaska App. 1996)).

Alvarez-Perdomo to the stand, and when [it] then summoned the jury to hear Alvarez-Perdomo's testimony" despite his equivocal answers.[12]  The court of appeals concluded that the trial court erred "by coercing Alvarez-Perdomo to take the stand."[13]

The court of appeals ultimately reasoned, however, that the error was harmless beyond a reasonable doubt because, given the overwhelming evidence against Alvarez-Perdomo, there was no "reasonable possibility that the jury might have returned a different verdict . . . if Alvarez-Perdomo had not given his testimony."[14]

### 3.    Petition for hearing

Alvarez-Perdomo filed a petition for hearing with this court. He argued that the court of appeals erred when it determined that the violation of his privilege against self-incrimination was a trial error, rather than a structural error.  In the alternative, he argued that the court of appeals erred when it held that the error was harmless beyond a reasonable doubt.  We granted Alvarez-Perdomo's petition for hearing on both questions.

The State cross-petitioned for hearing, arguing that the court of appeals used the incorrect standard of review to determine if a constitutional error occurred.  The State argued that whether Alvarez-Perdomo wanted to testify was a question of fact that should be reviewed for clear error.  We denied the State's cross-petition, leaving the court of appeals decision on this issue as it stands.

---

[12]     *Id.* at 226.

[13]     *Id.* at 229.

[14]     *Id.* at 227-28 (citing *Anderson v. State*, 337 P.3d 534, 540 (Alaska App. 2014)).

## III.  STANDARD OF REVIEW

"Determining the appropriate standard of review is . . . a question of law that we review de novo."[15]  Under this standard of review, we adopt "the rule of law that is the most persuasive in light of precedent, reason, and policy."[16]

## IV.  DISCUSSION

The United States Supreme Court has established two categories of constitutional errors:  structural errors and trial errors.  The Court has held that many constitutional errors are trial errors, which are subject to harmless-error analysis.[17]  These constitutional errors require a new trial unless the errors are "harmless beyond a reasonable doubt."[18]  Although "most constitutional errors can be harmless," the Court has recognized a special structural constitutional error category for "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."[19]  Structural errors are "intrinsically harmful . . . without regard to their effect on the outcome."[20]  In other words, a structural error "affects the entire framework of the

---

[15]     *Jordan v. State*, 420 P.3d 1143, 1148 (Alaska 2018) (quoting *Hutton v. State*, 350 P.3d 793, 795 (Alaska 2015)).

[16]     *Id.* at 1148 (quoting *Khan v. State*, 278 P.3d 893, 896 (Alaska 2012)).

[17]     The Court provides a long list of constitutional errors subject to harmless-error analysis in *Arizona v. Fulminante*, 499 U.S. 279, 306-07 (1991).

[18]     *Chapman v. California*, 386 U.S. 18, 24 (1967).

[19]     *Fulminante*, 499 U.S. at 309.

[20]     *Neder v. United States*, 527 U.S. 1, 7 (1999).

case."[21]  These structural errors require automatic reversal and a new trial.[22]  We apply the general framework established by the Supreme Court,[23] although Alaska's constitutional protections are not limited by the reach of their federal counterparts.[24]

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."[25]  And article I, section 9 of the Alaska Constitution provides that "[n]o person shall be compelled in any criminal proceeding to be a witness against himself."[26]  We have not yet decided whether compelling a criminal defendant to testify at trial is a structural error.

Alvarez-Perdomo argues that it is.  In the alternative, he argues that the court of appeals erred when it determined that the error in his case was harmless beyond a reasonable doubt.

## A.    The Superior Court Committed Structural Error When It Compelled Alvarez-Perdomo To Take The Stand.

The Supreme Court recently clarified its structural error doctrine in *Weaver v. Massachusetts*, explaining that although "at least three broad rationales" animate the structural error case law, the underlying "purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the

---

[21]    *Jordan*, 420 P.3d at 1153.

[22]    *Id.* at 1148.

[23]    *Id.*

[24]    *Id.* at 1153.

[25]    U.S. Const. amend. V.

[26]    Alaska Const. art. 1, § 9.

framework of any criminal trial."[27] Reviewing its precedents, the Court determined that an error has been deemed structural when: (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) the effects "are simply too hard to measure"; and (3) it "always results in fundamental unfairness."[28] The Court further explained:

> These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural. For these purposes, however, one point is critical: An error can count as structural even if the error does not lead to fundamental unfairness in every case.[29]

In contrast, constitutional violations found subject to harmless-error analysis have "each involved 'trial error' — error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."[30]

Alvarez-Perdomo argues that each of the three rationales identified in *Weaver* is applicable to his case, and that it was therefore error for the court of appeals to hold that the violation of his right against self-incrimination was "amenable to a harmless error analysis."[31] We conclude that the error was structural based on the first rationale.

---

[27] 137 S. Ct. 1899, 1907-08 (2017).

[28] *Id.* at 1908.

[29] *Id.* (internal citations omitted).

[30] *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991).

[31] *Alvarez-Perdomo v. State*, 425 P.3d 221, 226 (Alaska App. 2018).

-13- 7424

In *Weaver* the Supreme Court explained that "an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest."[32] As an example the Court discussed the right to conduct one's own defense, "which, when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant.' "[33] The Court explained that this right "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty" and that its violation is a structural error because "harm is irrelevant to the basis underlying the right."[34]

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."[35] This portion of the Fifth Amendment has traditionally been described as the privilege against self-incrimination.[36] "[S]ince the most fundamental part of that protection is the right of an accused in a criminal trial not to be compelled to be a witness for the prosecution, it is appropriate to continue to regard

---

[32]     *Weaver*, 137 S. Ct. at 1908.

[33]     *Id.* (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

[34]     *Id.* (first citing *Faretta v. California*, 422 U.S. 806, 834 (1975); then citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)).

[35]     U.S. Const. amend. V.

[36]     As the Supreme Court has observed, "[t]he term 'privilege against self-incrimination' is not an entirely accurate description of a person's [Fifth Amendment] constitutional protection against being 'compelled in any criminal case to be a witness against himself.' " *United States v. Hubbell*, 530 U.S. 27, 34 (2000). The word "witness" limits the application of the privilege to testimonial communications. *See id.* at 34-35.

the right as a privilege albeit with implications beyond those of other evidentiary privileges."[37]

Concerns about the use of compelled self-incriminatory testimony span centuries of legal history. Although the exact origins of the privilege against self-incrimination are debated, legal scholarship suggests that "its development was intimately intertwined with the political and religious disputes of early England."[38] In many common law criminal trials prior to the seventeenth century, the accused "was expected to take an active part in the proceedings, often to his own detriment."[39] Before trial, and often prior to the presentment of charges, the accused was examined by justices of the peace, "and the results of this examination were preserved for use by the judge at trial."[40] Puritans protested the use of coercive oaths and compelled self-incrimination as early as 1604.[41] After 1641 the common law courts began to apply restrictions to the use

---

[37] 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 114, at 686 (7th ed. 2013).

[38] *Id.* at 687. In the early thirteenth century, "[u]nder the 'inquisitorial oath,' there was active interrogation of the accused by the judge" after the accused had been forced to take a religious oath to answer truthfully. *Id.* Two controversial courts later adopted the inquisitorial oath procedure and used it for political and religious purposes: the Star Chamber and Court of the High Commission in Causes Ecclesiastical. *Id.*

[39] *Id.* (citing E. M. Morgan, *The Privilege Against Self-Incrimination*, 34 MINN. L. REV. 1, 12-23 (1949); 8 WIGMORE, EVIDENCE § 2250, at 285-86 (McNaughton rev. 1961)).

[40] *Id.* (citing WIGMORE, *supra* note 39, at 285).

[41] R. Carter Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America*, 21 VA. L. REV. 763, at 770 (1934-35). As noted by Pittman's historical analysis, the abusive practices of these courts drove many to leave for New England. *Id.* at 770-71.

of the inquisitorial oath.[42]

There is no single scholarly consensus on the historical narrative of the privilege against self-incrimination in America.[43] Historical evidence from early colonial America suggests that the judicial process, especially in New England, was inquisitorial and heavily influenced by the clergy.[44] However, the privilege was included in the constitutions or bills of rights of seven states before 1789,[45] and the privilege has been included in the constitutions of all but two states.[46]

Although different conclusions may reasonably be drawn about the motivations for including the privilege against self-incrimination in the Bills of Rights,[47]

---

[42] BROUN ET AL., *supra* note 37, § 114, at 688.

[43] *Id.* at 688-89; *see also* Pittman, *supra* note 41, at 764-65 (presenting historical analysis contradicting Wigmore's analysis).

[44] Pittman, *supra* note 41, at 767-68. The colonists insisted on protection from abusive practices such as protection against compulsion to confess one's own delinquency as evidenced by the 1641 Body of Liberties. *Id.* at 775-76. The Puritan opposition to testamentary compulsion made it "apparent that the Puritan mind placed the ecclesiastical oath in the category of 'tortures' just as it did the rack, the boot and the thumbscrew." *Id.* at 778-79.

[45] These states were Maryland, Massachusetts, New Hampshire, North Carolina, Pennsylvania, Vermont, and Virginia. *Id.* at 765.

[46] New Jersey and Iowa did not include the privilege in their constitutions, but rather their courts have held it part of the existing state law. *See id.* at 763 n.1 (citing *State v. Height*, 91 N.W. 935 (Iowa 1902) (concluding state constitutional guarantee of due process includes protection from compelled self-incrimination); *State v. White*, 142 A.2d 65 (N.J. 1958) (determining there is no state constitutional prohibition against compelled self-incrimination, but statutory provisions are "no less urgent and protective")).

[47] BROUN ET AL., *supra* note 37, § 114, at 688 (describing Bentham as

(continued...)

one of the underlying rationales is animated by concerns about protecting the defendant's personal dignity:

> [T]his policy suggests at least limited objection to the use of information extracted from the mouth of the accused as the basis for a criminal prosecution. This early suspicion of compulsory self-incrimination . . . seems to be based upon a perception that compelling an individual to provide the basis for his own penal liability should be limited because of the position in which it places the individual, making a choice between violating a solemn oath and incurring penal liability, weighs against important policies of individual freedom and dignity.[48]

Alvarez-Perdomo argues that the state and federal rights against self-incrimination protect "the underlying values of dignity, integrity, and privacy of an individual." Alaska and federal precedents support his argument that the criminal defendant's right not to take the stand protects personal dignity.

The Alaska Court of Appeals has explained that "[t]he privilege . . . ha[s] special meaning in a criminal trial as it relates to the defendant" because, in contrast to an ordinary witness, "[t]he right of the defendant is not only to avoid being compelled to give incriminating responses to particular inquiries, but to resist being placed in a position where inquiries can be put to him while he is under oath."[49] Thus, "there is a

---

**47** (...continued)
suggesting privilege was overreaction to historical use of oath procedure without proper presentment of charges) (citing WIGMORE, *supra* note 39, at 292); *see also* Pittman, *supra* note 41, at 763 (discussing difficulty of ascertaining insistence on including privilege against self-incrimination with certainty).

**48** BROUN ET AL., *supra* note 37, § 114, at 688.

**49** *Diggs v. State*, 274 P.3d 504, 506 (Alaska App. 2012) (quoting 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.5(a), at 424 (3rd ed. 2007)).

second aspect of the constitutional protection that applies only to defendants in criminal proceedings: they may not be called to the stand against their will."[50] This implicates defendants' dignity; the right does not simply govern the admission of evidence, but rather gives defendants control over whether to present themselves as witnesses at trial.[51]

In response the State argues that the privilege against self-incrimination is fundamentally a procedural trial right; that it "is specifically linked to the admission of evidence against the defendant to show his guilt in a criminal case." But the fact that a violation can occur only during criminal proceedings does not necessarily mean that the sole purpose of a defendant's right not to take the stand is to protect against erroneous conviction. There are structural errors that are tied to the trial process. For example, the right to conduct one's own defense is tied to the trial process and is a structural error when violated.[52]

There are few cases addressing the issue of a criminal defendant being compelled to take the stand. The State cites several cases to support its argument that this error is amenable to harmless error analysis. The facts of most of those cases, however, do not involve a defendant being compelled to take the stand.[53]

---

[50]    *Id.*

[51]    In *Murphy v. Waterfront Commission of New York Harbor*, the Supreme Court described compelling a defendant to choose among "self-accusation, perjury, or contempt" as a "cruel trilemma." 378 U.S. 52, 55 (1964), *abrogated by United States v. Balsys*, 524 U.S. 666 (1998).

[52]    *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

[53]    For example, in discussing *United States v. Goodwin*, the State explains that "the judge caused the defendant to testify by telling her that she had little chance of success unless she testified." 770 F.2d 631, 636-38 (7th Cir. 1985). In dicta, the court

(continued...)

Alvarez-Perdomo's primary support is *State v. Sierra*, a case directly on point from the Connecticut Supreme Court.[54] In *Sierra* a trial court compelled a criminal defendant to take the stand when called by his co-defendant by threatening him with contempt if he refused.[55] The State unsuccessfully attempts to distinguish the facts of *Sierra*, arguing that the defendant in *Sierra* testified under the threat of contempt, while Alvarez-Perdomo "wanted to testify, and that finding has not been overruled." This assertion by the State is a misstatement, as the court of appeals held that "the trial judge committed constitutional error by coercing Alvarez-Perdomo to take the stand."[56]

We also reject the notion that the only way to compel a defendant to be a witness at trial is to threaten him with contempt: The Fifth Amendment of the United States Constitution and article 1, section 9 of the Alaska Constitution both protect a

---

[53] (...continued)
added, though, that even if a constitutional violation had occurred, it would have been harmless because the defendant had been prepared to testify and because her testimony was "not garbled or confused — she seemed to know exactly what she was talking about." *Id.* It is noteworthy that in *Goodwin* the Seventh Circuit held that the trial court had improperly influenced the defendant's decision to testify but that this did not rise to the level of a Fifth Amendment violation. *Id.* at 637.

[54] 568 A.2d 448 (Conn. 1990).

[55] *Id*. at 456.

[56] *Alvarez-Perdomo v. State*, 425 P.3d 221, 229 (Alaska App. 2018). The court of appeals also stated that "a judge must not badger or coerce a defendant to take the stand. That is what happened in this case." *Id.* In addition to concluding that Alvarez-Perdomo was compelled to take the stand, the court also described the superior court's actions as forcing him to take the stand: "This is not to say that we condone what happened here. Having a trial judge force a reluctant or indecisive defendant to take the stand is inconsistent with the Fifth Amendment and the basic principles of our adversary system of justice." *Id.* at 228.

defendant from being "compelled" to be a witness at trial,[57] and it would be unduly narrow to read "compelled" as only encompassing situations in which a defendant is threatened with contempt. As the Connecticut Supreme Court noted in its *Sierra* analysis, through the language of the Fifth Amendment

> a criminal defendant is afforded "the right not only to avoid giving incriminating responses to inquiries put to him but also to be free from the inquiries themselves. Thus the privilege of an accused allows him not only to refuse to respond to questions directed at his alleged participation in the offense but also entitles him not even to be called as a witness at his own trial."[58]

The *Sierra* court reasoned that "the violation of a defendant's absolute right not to testify at [his] own trial" is a fundamental constitutional error.[59] The court concluded that this violation of a defendant's absolute right was incompatible with harmless error analysis[60] because this error implicated the integrity of the judicial system as well as individual dignity:

> [W]e find that to compel a criminal defendant to testify at his own trial in violation of his fifth amendment right not to take the stand derogates from the integrity of the constitution and

---

[57]     U.S. Const. amend. V.; Alaska Const. art. 1, § 9.

[58]     *Sierra*, 568 A.2d at 456 (quoting C. MCCORMICK, EVIDENCE § 130 (4th ed. 1984)).

[59]     *Id.* at 456-57.

[60]     *Id.* ("[H]armless error analysis has not been applied to rights that . . . promote systematic integrity and individual dignity." (quoting *Johnstone v. Kelly*, 808 F.2d 214, 218 (2d Cir.1986), *cert. denied*, 482 U.S. 928 (1987))).

the judicial system and affects an individual's dignity in such a way that cannot be tolerated.[61]

The court concluded that "compelling a criminal defendant to take the stand and to testify in a criminal prosecution against him is so fundamental an error that automatic reversal is required and may not be disregarded."[62]

The State counters that certain limits of the privilege against self-incrimination demonstrate that it is not designed to protect individual dignity, namely that defendants may be compelled to provide blood samples[63] and that individuals may be compelled to testify if granted immunity from future prosecution.[64] We disagree: the State's examples are not analogous to a criminal defendant being compelled to testify at trial.[65]

---

[61]    *Id.* at 457.

[62]    *Id.* at 456.

[63]    *See Schmerber v. California*, 384 U.S. 757, 760-65 (1966).

[64]    *See Kastigar v. United States*, 406 U.S. 441, 448 (1972).

[65]    The Supreme Court has held that the privilege against self-incrimination applies to testimonial communications, but not evidence of physical characteristics such as blood samples or handwriting samples. *United States v. Hubbell*, 530 U.S. 27, 34-35 (2000) (discussing limited applicability of privilege to testimonial communications); *see also* DAVID S. RUDSTEIN ET AL., 2 CRIMINAL CONSTITUTIONAL LAW § 6.02(1)(b) (2019) (citing *Schmerber v. California*, 348 U.S. 757 (1966) (addressing blood samples); *United States v. Mara*, 410 U.S. 19 (1973) (addressing handwriting samples)). Thus, the fact that the privilege against self-incrimination fails to reach involuntary blood samples does not mean that it does not protect a defendant's dignity. Nor does the fact that the privilege against self-incrimination does not reach a witness who does not face a risk of self-incrimination because the witness has been granted immunity from future prosecution. *Kastigar*, 406 U.S. 441; *State v. Gonzalez*, 853 P.2d 526 (Alaska 1983).

We agree with the *Sierra* court: Compelling a criminal defendant to testify at trial derogates from the integrity of the judicial system and unacceptably encroaches on individual dignity. A criminal defendant's right not to take the stand is a core protection of the Fifth Amendment of the United States Constitution and article 1, section 9 of the Alaska Constitution.[66] "The freedom of a defendant in a criminal trial to remain silent 'unless he chooses to speak in the unfettered exercise of his own will' is guaranteed by the Fifth Amendment."[67]

We conclude that compelling Alvarez-Perdomo to take the stand to testify in the case against him was a structural error requiring automatic reversal. A criminal defendant's right not to take the stand does not simply protect against the risk of erroneous conviction: It protects the criminal defendant from suffering the indignity of being compelled to take the stand to provide information that is against their own interest.[68]

---

[66] *See, e.g.*, *United States v. Patane*, 542 U.S. 630, 637 (2004) (plurality opinion) ("[T]he core protection afforded by the Self–Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." (citing *Chavez v. Martinez*, 538 U.S. 760, 764-68 (2003) (plurality opinion))); *Munson v. State*, 123 P.3d 1042, 1047 (Alaska 2005) ("[T]he core protection is a prohibition on compelling a defendant to testify against himself at trial").

[67] *Carter v. Kentucky*, 450 U.S. 288, 305 (1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

[68] As Justice Stevens observed, a defendant's decision to testify implicates interests outside of preventing erroneous conviction:

> The Constitution wisely commits the critical decision of whether the defendant shall take the stand to the defendant and his lawyer, rather than the judge, for at least two reasons. First, they have greater access to information bearing on the decision than the judge can normally have. Second, they are

(continued...)

## B. Trial Courts Must Take Care When Conducting The *LaVigne* Inquiry.

The purpose of the *LaVigne* inquiry is to ensure that defendants are informed of their right to testify and that the decision whether to testify is ultimately theirs.[69] Although some defendants will clearly express their desire not to testify, other defendants, like Alvarez-Perdomo, will struggle with this decision. When defendants are unwilling or unable to clearly assert that they want to waive the right to testify, judges are not required to continue questioning defendants until they provide a definite answer. Importantly, as emphasized by the court of appeals, judges must not compel defendants to take the stand if they provide equivocal responses to the *LaVigne* inquiry:

> [T]he *LaVigne* rule does not require a trial judge to obtain the defendant's affirmative waiver of the right to testify. Rather, the crucial aspect of the *LaVigne* inquiry is simply to make sure that the defendant *understands* that they have a legal right to testify and that they can assert this right regardless of what their attorney wants them to do.
>
> As subsequent cases have shown, there are occasionally times when a defendant will refuse to give a direct or unequivocal answer when the judge asks the defendant whether they wish to testify. In such circumstances, the *LaVigne* rule requires only that the judge fully inform the defendant of their right to testify. If the defendant then refuses to explicitly waive their right to testify, the trial judge cannot order the defendant to

---

[68]    (...continued)
motivated solely by concern for the defendant's interests; the judge inevitably is concerned with society's interest in convicting the guilty as well as protecting the innocent.

*Lakeside v. Oregon*, 435 U.S. 333, 344 (1978) (Stevens, J., dissenting); *see also Carter*, 450 U.S. at 299-300, 300 n.15 (1981) (discussing reasons unrelated to guilt or innocence defendant might refuse to take stand such as rough questioning, personal embarrassment, and potential incrimination of others).

[69]    *LaVigne v. State*, 812 P.2d 217, 219 (Alaska 1991).

take the stand. Rather, the judge should order the trial to proceed without the defendant's testimony.[70]

During the *LaVigne* inquiry the court should confirm that the defendant is informed that "[t]he ultimate decision whether to exercise the right [to testify] . . . rests with the defendant, not with defendant's counsel."[71] When safeguarding a defendant's right to testify through the *LaVigne* inquiry, we caution trial courts against going to the opposite extreme of compelling defendants to take the stand. The decision whether to testify belongs to the defendant, not the trial court.

## V.    CONCLUSION

We REVERSE the court of appeals' decision regarding harmless error. We REVERSE the judgment of conviction and REMAND to the superior court for a new trial.

---

[70]    *Alvarez-Perdomo v. State*, 425 P.3d 221, 226 (Alaska App. 2018) (emphasis in original) (internal citations omitted).

[71]    *LaVigne*, 812 P.2d at 219 (citing *Hughes v. State*, 513 P.2d 1115, 1119 (Alaska 1973)).