J-S06028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NAZEER TAYLOR | : | |
| | : | |
| Appellant | : | No. 856 EDA 2017 |

Appeal from the Judgment of Sentence January 31, 2017
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0003166-2014

BEFORE: BOWES, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JULY 29, 2021**

Nazeer Taylor has appealed from the judgment of sentence entered following his convictions for rape of a child and related offenses. He was a juvenile when he committed the offenses, but he was tried as an adult after the juvenile court granted the Commonwealth's petition to certify the case to criminal court. Taylor claims the court violated his Fifth Amendment privilege against compulsory self-incrimination by considering his failure to admit culpability when it granted certification, and that its certification order was an abuse of discretion.

In a prior decision in this case, we concluded that although the juvenile court had violated the privilege, its ultimate order granting certification was not an abuse of discretion in view of its consideration of other, permissible factors. The Pennsylvania Supreme Court granted review and agreed that the juvenile court had committed a Fifth Amendment violation. ***Commonwealth***

*v. Taylor*, 230 A.3d 1050, 1053 (Pa. 2020). Three Justices concluded that the error was prejudicial and would have reversed Taylor's judgment of sentence and discharged the defendant, finding no other remedy possible under the circumstances. *Id.* at 1075 (Baer, J., concurring and dissenting). The majority of the Court, however, determined that it could not address the applicability of the harmless error doctrine to the instant case without advocacy from the parties. The Court thus remanded to this Court for a determination of whether the harmless error doctrine is applicable here, and if it is not or if the error is not harmless, for consideration of the available relief. *Id.* at 1073.

Having received supplemental advocacy from the parties, we now conclude that the juvenile court's violation of Taylor's Fifth Amendment privilege constitutes structural error, not subject to harmless error review. Regarding the remedy, we follow the lead of the concurring and dissenting Justices and conclude that under Pennsylvania's statutory framework, dismissal is the only relief possible where a reversible error occurs at a certification hearing and the defendant turns 21 before the appellate process is complete. We therefore reverse.

## I.

### A.

Taylor was charged in a delinquency petition with multiple counts stemming from the sexual abuse of his foster brother, A.O., from July 2012 through August 2013. Taylor was 15 years old at the time of the crimes, and A.O. was 11 years old. Taylor was born in September 1996, and he is now

over the age of 21. The juvenile court held a certification hearing on April 2 and 25, 2014, to determine whether to transfer the case to criminal court.

At the hearing, A.O. testified that the abuse occurred while he and Taylor were living with their foster mother ("Foster Mother") and began shortly after A.O. began the sixth grade. N.T. Certification Hearing, 4/2/14, at 9, 11-30. A.O. stated that Taylor threatened to "beat [him] up" if he reported the abuse to anyone. *Id.* at 19. A.O. also testified that the assaults caused physical damage that affected his ability to control his bowels. *Id.* at 33.

Foster Mother testified that she observed behavioral changes in A.O., who "was trying to pull his tongue out of his mouth and . . . soiling his clothing." *Id.* at 79-80. Foster Mother also described a time when she discovered Taylor and A.O. in the bathroom together. *Id.* at 84-85.

The Commonwealth presented the expert testimony of Michael Yoder, a supervisor with the Montgomery County Juvenile Probation Department, regarding amenability to treatment and the options available in the juvenile and adult systems. N.T., 4/25/14, at 76, 78. He testified that the allegations against Taylor were not typical of juvenile sex offender behavior, given the seriousness of the crimes and the sophistication Taylor displayed in committing them. *Id.* at 88-89. He noted that Taylor committed the crimes "while he was in foster home placement, under the roof of the foster parents while the foster parents were at home, [by] going into the victim's room and . . . into the bathroom." *Id.* Taylor also committed the assaults after having been convicted of burglary and undergoing intensive therapy. *Id.* at 89. Yoder

explained that residential treatment for sex offenders takes a minimum of two years, and that the juvenile system would retain jurisdiction over Taylor for only one year after his release from such a program. *Id.* at 90-91. Yoder therefore opined that Taylor was not amenable to treatment in the juvenile system. *Id.* at 90. Instead, Yoder recommended the youthful offender program at the State Correction Institution at Pine Grove. *Id.* at 91.

Taylor countered with the testimony of Dr. Nicole Machinski, an expert in the identification and treatment of juvenile sex offenders and in the certification of sex offenders. *Id.* at 9, 12. Dr. Machinski described Taylor's family background and his history of suffering neglect and abuse. *Id.* at 13-15. Dr. Machinski diagnosed Taylor "with adjustment disorder with mixed anxiety and depressed mood, as well as physical abuse of a child and sexual abuse of a child." *Id.* at 15. Dr. Machinski also testified regarding Taylor's criminal history and his previous experience and progress with therapy. *Id.* at 16-20. The doctor opined that Taylor would be amenable to treatment in the juvenile system. *Id.* at 27. She reached this conclusion because he "had very little opportunity to benefit from any kind of treatment provided by the juvenile justice system thus far," he had shown that he responds well to consistent treatment, and he expressed a willingness to participate in treatment. *Id.* at 27.

On cross-examination, Dr. Machinski stated that she based her testimony on her interviews with Taylor, Taylor's counsel, and the Department of Human Services ("DHS") worker, and on her review of Taylor's DHS file.

*Id.* at 31-32. Dr. Machinski drew a distinction between Taylor's previous treatment and sex offender treatment. She noted that his prior treatment had focused on defiance and oppositional behavior, rather than inappropriate sexual behavior. *Id.* at 42. However, she agreed that a person who exhibits antisocial behavior, such as residential burglary, would be less amenable to treatment. *Id.* at 44-45.[1]

At the conclusion of the hearing, the juvenile court determined that Taylor should be tried as an adult and certified the case to the criminal division. It provided the following rationale, citing various factors, including that Taylor had not admitted having committed the sex offense:

> I think one of the Commonwealth's arguments is that the defendant has been in treatment for almost every issue that the defendant's expert has identified and, notwithstanding that treatment, within six months committed a series of forcible rapes, which is much more serious than the issue he was in treatment for.
>
> I think the defense expert makes a distinction, and so does the defendant -- or they make a good point, not necessarily a distinction -- when they say, look, the sex offense is totally different than the burglary. And because someone was successful in a burglary, that's not at all related to the sexual offense, and he never really got treatment for the sexual offense. That's basically the argument as I understand it.
>
> And I don't necessarily disagree with that, but then I think the defense expert becomes a little bit inconsistent and sort of goes back and forth where she counters that particular Commonwealth with [sic] you can't compare these other matters to a sex offense, but then she goes back and forth

---

[1] Taylor also presented Alda Sales-Vinson, the caseworker from DHS who had been overseeing Taylor's case.

and says but because he did well in treatment in the other matters, he will do well for treatment as a sex offender. So in one sense, she tries to separate the two, and then in another sense, she tries to blend the two, and I find that testimony to be inconsistent.

I think another dilemma or conundrum for the defense is that's their approach, he's had an unfortunate upbringing, through no fault of his own. To a [ ] certain extent, he is antisocial and damaged, and that's not his fault. But is he so damaged that he can't be rehabilitated for a sex offender, or can he be rehabilitated for a sex offender? And I think part of the dilemma is they don't distinguish sex offenders from burglary, so now they blend their argument and say because he's done well in the first, he can do well in the second.

And they won't admit that he's committed the sex offense, and that's sort of their conundrum, because time is of the essence. He's approaching 18 years old. The act -- you can argue degree of sophistication all you want, but it was a predatory damaging act that occurred repeatedly over a 1-year period of time.

If you're going to go on the sex offenders' treatment, it's important that you admit, No. 1; examine your triggers, No. 2; talk about how you can avoid your triggers; and identify up-front the depth of the problem. And here, we can't identify the depth of the problem largely because we're not admitting yet that there is a problem.

What if he were to sit there for a year and a half before he finally admitted that he did something? I mean, I assume he's still denying. Counsel's arguments have been phrased "if this is true, it's a horrendous act."

They made a distinction when he denied, when he said to Dr. Buxbaum -- I believe he was a psychiatrist -- "I didn't do anything wrong." Counsel said now he wants to say he participates in treatment and defense counsel argued, well, maybe the treatment's not talking about sex offenders' treatment. And that's the very issue, though, is he amenable to sex offenders' treatment? And, in the juvenile system, time is running out. As I said, there is only a few years left, and the depth -- and if he doesn't make sufficient progress, he's 21, he's back on the streets, and he's

released from the jurisdiction of the Court with no supervision at all. That's the dilemma.

And when Dr. Machinski in her report indicates the issues that he needs treatment in and the Commonwealth argues, well, none of this has to do with amenability within the statute, well, it might, when you have four other categories. It would certainly refer to amenability for a crime that's much less serious than this. But I don't know that it means anything with regard to somebody who's committed the type of act that he's alleged to have committed.

So for all the reasons in the statute as enumerated by [the Commonwealth] and because it's the defense burden of proof, I'm going to grant the Commonwealth's motion to certify him to adult court. Thank you.

*Id.* at 112-15.

Following the transfer, a jury found Taylor guilty of numerous crimes: rape of a child; rape by forcible compulsion; rape by threat of forcible compulsion; three counts each of involuntary deviant sexual intercourse by forcible compulsion, involuntary deviant sexual intercourse by threat of forcible compulsion, and involuntary deviate sexual intercourse with a child; four counts of sexual assault; two counts of indecent assault by forcible compulsion; and indecent assault of a person less than thirteen years of age.[2] The court sentenced Taylor on January 31, 2017, to an aggregate term of ten to 25 years' incarceration, followed by ten years' probation.

---

[2] 18 Pa.C.S.A. §§ 3121(c), (a)(1), (a)(2); 3123(a)(1), (a)(2), (b); 3124.1; and 3126(a)(2) and (a)(7), respectively.

**B.**

Taylor filed a timely appeal,[3] and we held that the juvenile court had erroneously considered Taylor's failure to admit guilt, but found that, in view of the record as a whole, the court did not abuse its discretion in granting certification. The Pennsylvania Supreme Court granted Taylor's petition for allowance of appeal and held that "a minor's refusal to confess to an act for which he or she might be criminally prosecuted as an adult may not be considered when deciding whether to certify a case for transfer between juvenile and adult court." ***Taylor***, 230 A.3d at 1072. It concluded that "[b]ecause the juvenile court exacted a price for Taylor's exercise of his rights under the Fifth Amendment, its decision reflects a misapplication of the law, and thus an abuse of discretion." ***Id.*** at 1073.

The Court then addressed the harmless error doctrine. It noted that "[t]raditionally, the prosecution bears the burden of demonstrating that any prejudice . . . did not redound to the defendant's detriment." ***Id.*** It pointed

---

[3] Taylor presented the following issues on appeal:

> 1. Whether the trial court erred in certifying [Taylor] to be tried as an adult.
>
> 2. Whether the trial court erroneously denied [Taylor]'s mistrial motion.
>
> 3. Whether the trial court erred in preventing [Taylor] from introducing evidence indicating that [A.O.] had bowel control problems before he ever met [Taylor].

Taylor's Br. at 10.

out, however, that here, the Court was "presented with a Fifth Amendment violation which was squarely committed by a juvenile court, sitting as the finder of fact, charged with the solemn duty to adjudicate whether a minor should be tried as an adult." *Id.* The Court concluded that the United States Supreme Court "did not affix the appropriate remedy in this rare context" and the Court was "without advocacy on the significant question of whether the instant violation ranks as error of the kind the Supreme Court has deemed 'structural,' and thus beyond remediation under a harmless error review." *Id.* The Court therefore remanded to this Court "for a determination, in the first instance, and with developed advocacy of the parties, of whether the harmless error doctrine is applicable to the juvenile court's constitutionally deficient misapplication of the Juvenile Act's transfer provisions and, if it is not or if the error is not harmless, for consideration of the available relief under these circumstances." *Id.*

Justice Baer filed a concurring and dissenting opinion, joined by Justice Donohue and Justice Dougherty. Justice Baer agreed that a Fifth Amendment violation occurred, but would have found that the Juvenile Court committed "prejudicial error by relying on Taylor's refusal to admit guilt against him in its decision to certify Taylor to be tried as an adult." *Id.* at 1074. He noted that the juvenile court stated it relied on Taylor's refusal to incriminate himself when making its decision to certify the case. Justice Baer pointed out that the juvenile court emphasized that Taylor had not admitted that he had committed the offense and considered his refusal "problematic because, *inter alia*: (1)

time was essential for treatment; (2) if Taylor's denial continued, it would prevent effective treatment; and (3) Taylor's refusal to admit guilt would make it difficult to identify the depth of Taylor's problem for purposes of treatment." *Id.* (citation omitted). Justice Baer concluded that "the record sufficiently establishes that there is at least a 'reasonable possibility' that the juvenile court's error 'might have contributed' to its decision to certify Taylor to be tried as an adult; consequently, the error was prejudicial." *Id.* He would therefore "conclude that the juvenile court relied on a constitutionally impermissible factor in deciding to transfer Taylor to adult court and that this reliance was prejudicial." *Id.*

Justice Baer also concluded that, as Taylor was over the age of 21, no court had jurisdiction to hold a renewed certification hearing and, therefore, the only available remedy was dismissal. *Id.* at 1074-75. He would have vacated the judgment of the Superior Court, reversed the judgment of sentence, and, "assuming that [Taylor] has not committed other crimes that would place him under the purview of the criminal justice system, [would have] direct[ed] that he be discharged." *Id.* at 1075.

## II.

Following remand, the parties submitted additional briefing on 1) whether the error was a structural error; 2) if the error was not a structural error, whether it was harmless; and 3) if it was a structural error, or not harmless, what the appropriate remedy would be. We now answer the questions the Supreme Court directed us to consider on remand.

- 10 -

**A. Whether the Error is Structural**

1. The Parties' Arguments

Taylor argues that the error was a structural error, and therefore not amenable to the harmless error standard. He argues that "misapplying the law to deny a defendant's constitutional rights can never be 'the type of *de minimis* infraction which might form the basis for a harmless error finding.'" Taylor's Supp. Br. at 22 (quoting ***Commonwealth v. Lewis***, 598 A.2d 975, 982 (Pa. 1991) (internal quotation marks omitted)). Taylor relies on ***Lewis*** and ***Commonwealth v. Edwards***, 637 A.2d 259 (Pa. 1993), to argue that the Fifth Amendment violation is not amenable to harmless error analysis. He further relies on ***Commonwealth v. Kelly***, 724 A.2d 909 (Pa. 1999), and ***Commonwealth v. Bethea***, 379 A.2d 102 (Pa. 1977).

The Commonwealth argues the harmless error doctrine does apply here. It maintains that to determine whether the harmless error doctrine applies, courts must determine whether the error is structural; if it is, then the harmless error doctrine is inapplicable. The Commonwealth states that structural defects are those that "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself." Commonwealth's Br. at 30 (quoting ***Arizona v. Fulminante***, 499 U.S. 279, 310 (1991)). The Commonwealth argues that the error here was not a structural defect in the framework of a trial, or a defect that related to the determination of guilt or innocence. Rather, the Commonwealth contends, it was an error in process, "pertaining to the consideration of a single factor

(acceptance of responsibility) among several other factors to be weighed in the procedural context of determining whether [Taylor] should be tried as an adult." *Id.* at 30-31. It claims the "remaining factors can be readily weighed without considering the impermissible factor to determine the degree to which the impermissible factor altered the outcome of the proceeding." *Id.* at 31.

### 2. Relevant Law

Generally, "a constitutional error does not automatically require reversal of a conviction." *Fulminante*, 499 U.S. at 306. Rather, courts "ha[ve] applied harmless-error analysis to a wide range of errors and ha[ve] recognized that most constitutional errors can be harmless." *Id.* The United States Supreme Court explained that "[t]he common thread" among cases employing a harmless error analysis "is that each involved 'trial error,'" which the Court described as an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-08. In contrast, errors that the Court has termed "structural" warrant relief, "entitling the defendant to automatic reversal without any inquiry into prejudice." *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1905 (2017).

In *McCoy v. Louisiana*, the United States Supreme Court reiterated that structural errors are not subject to harmless error review. 138 S.Ct. 1500, 1511 (2018). The Court there was tasked with deciding whether defense counsel's admission of the defendant's guilt over the defendant's objection

amounted to structural error. It concluded that the error was indeed structural, for two reasons. The Court explained that the error "'affect[ed] the framework within which the trial proceed[ed],'" which the Court distinguished from "a lapse or flaw that is 'simply an error in the trial process itself.'" ***Id.*** (citation omitted). It also found that the error involved a right "'not designed to protect the defendant from erroneous conviction but instead protects some other interest,' such as 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.'" ***Id.*** (citation omitted).

The Pennsylvania Supreme Court has similarly found some errors either not amenable to harmless error analysis or *per se* reversible. In ***Lewis***, the Pennsylvania Supreme Court held a constitutional violation occurred when the defendant did not testify at trial and requested the trial court give a "no adverse inference" jury charge, but the court failed to give the charge. 598 A.2d at 980. The Court held that "given the importance of this issue for courts and litigants . . . , the failure to give such a 'no-adverse-inference' charge, when requested to do so in a timely fashion, *can never amount to harmless error*." ***Id.*** at 981 (emphasis in original). It reasoned that "[g]iven the strong constitutional underpinnings of the 'no-adverse-inference' charge, its omission may never be treated lightly." ***Id.*** It stated that, "[b]ecause the right of a criminal defendant to decline to take the stand without adverse comment or inference is a fundamental one under Article I, Section 9, the failure of the trial court to give the 'no-adverse-inference' instruction when so requested is

far from the type of '*de minimis*' infraction which might form the basis for a 'harmless error' finding." ***Id.*** at 982.

In ***Edwards***, the Pennsylvania Supreme Court announced that it would in future cases be "*per se* reversible error," and not susceptible to harmless error analysis, if a judge gave a "no adverse inference" charge "when the defendant has requested that no such instruction be given." 637 A.2d at 261. However, the Court made no statement as to whether the error was structural. Rather, in finding the error would be reversible *per se*, the Court stated that such a rule "will avoid time[-]consuming appeals arguing about harmless error and will clearly instruct trial judges as to how to proceed on this question." ***Id.*** It imposed the rule to future cases only, however, finding that providing the "no-adverse-inference" instruction was harmless beyond a reasonable doubt in the case before it, as the evidence was overwhelming. ***Id.***

In ***Kelly***, the Court concluded that a harmless error analysis was not warranted where a jury instruction violated Due Process by creating an impermissible mandatory presumption with respect to a material element of the crime charged. 724 A.2d at 913. The mandatory presumption permitted the jury to find a material element met without concluding the Commonwealth had proved it beyond a reasonable doubt. ***Id.*** at 911. The Court in effect considered the error structural, stating that the erroneous instruction had illegally "shifted the burden to the accused to disprove a material element of the crime" and engaging in harmless error review on appeal would improperly invade the jury's function. ***Id.*** at 913-14.

- 14 -

Other of the Pennsylvania Supreme Court's decisions are relevant here. In **Bethea**, the Court held it was "constitutionally impermissible for a trial court to impose a more severe sentence because a defendant has chosen to stand trial rather than plead guilty." 379 A.2d at 105. The Court reasoned:

> That principle is premised primarily upon the rationale that the right to a trial by jury is a fundamental one, constitutionally guaranteed to all criminal defendants, and that a practice which exacts a penalty for the exercise of the right is without justification and unconstitutional. The price exacted by imposing a harsher sentence on one who chooses to put the state to its proof by a jury trial rather than plead guilty is obvious. Not only is the individual defendant penalized for the present exercise of his constitutional right but, should the practice become sufficiently well known within a given jurisdiction, a substantial chilling effect on the exercise of the right would inevitably ensue.

**Id.** at 104 (footnotes omitted).

The Court remanded for resentencing without mention of the possibility of harmless error. It explained that to determine whether to vacate the sentence where the trial court has committed such an error, courts must ask "not whether the trial court considered legitimate factors in fixing sentence, but whether it considered only such factors." **Id.** at 106. The Court concluded that "any increase in sentence which results from a defendant's decision to put the state to its proof puts a price upon the exercise of a fundamental constitutional right, and hence is unjustified." **Id.**

We find particular guidance in **Interest of J.M.G.**, 229 A.3d 571, 573-74 (Pa. 2020), in which the Court held the harmless error doctrine inapplicable

to violations of psychotherapist-patient privilege in Act 21 proceedings, which relate to the involuntary commitment of certain sexually violent persons.[4] In *J.M.G.*, the Sexual Offender Assessment Board ("SOAB") submitted an assessment to the trial court, that relied, in part, on a psychiatric evaluation that contained un-redacted, incriminating statements J.M.G. had made to his psychiatrist. *Id.* at 574-75. Based on the SOAB assessment, the trial court found there was a *prima facie* case to initiate civil commitment proceedings. *Id.* at 575. At the civil commitment hearings, a witness summarized the psychiatric evaluation, and following the hearing, the court ordered J.M.G.'s commitment. *Id.*

The Supreme Court concluded that this was a violation of the privilege, and that in the context of an Act 21 proceeding, such a violation could not be treated as harmless. *Id.* at 583. It explained that "the harm to the therapeutic relationship and the efficacy of mental health treatment that Section 5944 is

---

[4] "Act 21 governs situations where certain sexually violent persons may be involuntarily committed for treatment and applies under circumstances described in the Juvenile Act." *In re H.R.*, 227 A.3d 316, 319 (Pa. 2020) (citing 42 Pa.C.S.A. §§ 6301-6375). "[T]he Juvenile Act provides that a child who is adjudicated delinquent may be . . . committed to 'an institution, youth development center, camp, or other facility for delinquent children operated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare[.]'" *Id.* (quoting 42 Pa.C.S.A. § 6352(a)(3)). A child so committed "and who remains committed upon reaching 20 years of age 'shall be subject to an assessment by the [Sexual Offender Assessment Board]' 42 Pa.C.S.[A.] § 6358(a), to determine 'whether or not the child is in need of commitment for involuntary treatment due to a mental abnormality . . . or a personality disorder, either of which results in serious difficulty in controlling sexually violent behavior.'" *Id.* (quoting 42 Pa.C.S.A. § 6358(c)).

designed to protect, is not entirely tangential to the factual burden in Act 21 proceedings." *Id.* at 582-83. It reasoned that "[a] primary purpose of Act 21 is to provide continued mental health treatment to a class of juvenile offenders[, and t]he success of mental health treatment, including the willingness of the juvenile to cooperate with treatment, to be open and candid in communicating with the psychotherapist, and to trust in treatment recommendations, is dependent on the confidentiality protected by the privilege set forth in Section 5944." *Id.* at 583. Therefore, the "[e]rosion of the privilege can only complicate and adversely affect the fundamental rehabilitative goals of the juvenile system and any treatment ordered under Act 21." *Id.* The Court therefore concluded that the constitutional error that was "so basic to a fair trial that application of the harmless error doctrine is inappropriate . . . ." *Id.*

3. <u>The grant of certification based in part on the juvenile's failure to admit culpability is not subject to harmless error analysis.</u>

The constitutional error here – the juvenile court's violation of Taylor's Fifth Amendment right when deciding whether Taylor should be tried as adult – is a structural error and therefore cannot be declared harmless. The privilege against compulsory self-incrimination is essential to the criminal justice system, for both individuals and society. Like the right at issue in *McCoy*, it serves not to prevent an erroneous conviction, but "protects some other interest," that is, the foundational principle that a person should not face the "cruel trilemma of self-accusation, perjury, or contempt." *McCoy*, 138 S.Ct.

at 1511; *Taylor*, 230 A.3d at 1064 (quoting *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 414 n.12 (1966).

The Alaska Supreme Court recently reached a similar conclusion. In *Alvarez-Perdomo v. State*, 454 P.3d 998, 999 (Alaska 2019), the court concluded that compelling a defendant to testify in violation of the Fifth Amendment privilege was structural error. The court reached that conclusion because the privilege protects not only against a mistaken conviction, but also against the defendant "suffering the indignity of being compelled to take the stand to provide information that is against their own interest." *Id.* at 1008.[5] That same concern holds sway here, even though the certification court did not compel Taylor to take the stand, but rather held his silence against him. In the end, Taylor was given a Hobson's choice: remain silent in the face of the certification judge's holding his silence against him, or admit guilt at the certification hearing and have the Commonwealth almost certainly use his admission against him at trial.

A juvenile certification hearing is of "great significance" to a juvenile and determines whether the individual will benefit from the juvenile court system policies, or be subject to the criminal justice system. *Taylor*, 230 A.3d at 1066 (quoting *Breed v. Jones*, 421 U.S. 519, 535 (1975)). Where a juvenile court relies on a defendant's refusal to admit guilt and uses that refusal as a basis

---

[5] *See also City of Cleveland v. Mincy*, 118 N.E.3d 1163, 1172 (Ohio Ct. App. 2018) (holding trial judge's comment on defendant's failure to testify was structural error); *cf. State v. Loher*, 398 P.3d 794, 815 (Haw. 2017) (finding structural error under state constitution).

to decide to certify the case to a trial court, the error is a structural error. Such reliance is intertwined with the decision to certify the case, and, similar to a court's failure to inform a jury that it may not draw an adverse inference from a defendant's silence, it can never be harmless.

### B. Remedy

We must next determine the proper remedy. We conclude that the only available remedy is this case is dismissal.

### 1. The Parties' Arguments

Taylor argues that the proper remedy is his discharge. He acknowledges that, ordinarily, where a court abuses its discretion in ruling on a certification hearing, the proper remedy is remand for a new certification hearing. However, such relief is not possible here because Taylor is over the age of 21. He notes that the juvenile court lost jurisdiction over him after he turned 21, and that the trial court cannot obtain jurisdiction over him without a valid certification issued by the juvenile court. Taylor notes that the Commonwealth conceded before the Supreme Court that, if Taylor prevailed on the merits, the proper remedy would be his release. Taylor's Supp. Br. at 38 (quoting N.T., Nov. 19, 2019). He further notes that the concurring and dissenting Justices concluded that the only possible remedy was discharge, since the certification to criminal court was improper and he has aged out of the juvenile court's jurisdiction.

Taylor distinguishes **Kent v. United States**, 383 U.S. 541, 565 (1966). There, the United States Supreme Court found the juvenile court had erred in

- 19 -

sending a case involving a juvenile to criminal court for trial. However, because the defendant had passed the age of 21, the juvenile court no longer had jurisdiction and the Supreme Court could not remand to juvenile court. Instead, in view of a Washington, DC statute that allowed the federal district court to exercise all of the powers of the District of Columbia juvenile court, the Court remanded to the federal district court.

Taylor argues that Pennsylvania does not have a comparable "safety valve" statute that would allow a case to be heard in the adult system when the defendant aged out of the juvenile system. Taylor's Supp. Br. at 42-43. Taylor notes that the Pennsylvania Supreme Court has found a transfer order to be jurisdictional and that "if the challenged order is improper, jurisdiction does not vest with the receiving court." Taylor's Reply Br. at 15 (quoting **Commonwealth v. Johnson**, 669 A.2d 315, 321 (Pa. 1995)). He concedes that the Courts of Common Pleas have broad original jurisdiction, but argues that the juvenile division is the part of the Common Pleas to which this matter should be returned. He contends "[t]he Commonwealth does not get to select a different division simply because the constitutional error which led the case to be erroneously heard in the adult system now prevents the case from being returned to the juvenile system because of the happenstance of Mr. Taylor's age." **Id.** at 16.[6]

_____

[6] Taylor further argues that the Commonwealth had already conceded before the Supreme Court that remand and discharge was the only remedy, and it
_(Footnote Continued Next Page)_

- 20 -

The Commonwealth maintains that the appropriate remedy is to grant a new certification hearing. It claims that, contrary to Taylor's suggestion, **Kent** is not distinguishable and the Supreme Court's decision there did not use the phrase "safety valve." Rather, the Commonwealth says, the structure of District of Columbia and Pennsylvania laws in this regard are similar, and the statutes should be interpreted similarly. It further argues, regardless of whether there is a "safety valve," **Kent** does not support the limitation placed on it by Taylor. The Commonwealth argues that the Court there did not suggest that "without some 'safety valve' in the D.C. Code, it would have discharged the defendant rather than remand because he had somehow managed to escape accountability in the courts by aging his way into jurisdictional limbo." Commonwealth's Supp. Br. at 17.

The Commonwealth also states that if a "safety valve" were needed, Pennsylvania law provides one, in that the Court of Common Pleas of a judicial district has unlimited original jurisdiction. It points to Article V, Section 5 of the Pennsylvania Constitution, which provides, "There shall be one [C]ourt of [C]ommon [P]leas for each judicial district (a) having such divisions and

_____

cannot now change course. Taylor notes that this Court has previously admonished the Commonwealth "against the prosecution changing its stance at different stages in litigation in order to gain or maintain an upperhand over the defendant, as "[t]he high purpose of a prosecutor is to do justice, not to hand [sic] onto a conviction." Taylor's Reply Br. at 19 (quoting **Commonwealth v. Johnson**, 456 A.2d 988, 993 (Pa.Super. 1983)). This argument lacks merit. There is no estoppel because the Supreme Court did not adopt the Commonwealth's alleged concession. Furthermore, the Pennsylvania Supreme Court directed us to determine the proper remedy, after receiving developed advocacy of the parties.

consisting of such number of judges as shall be provided by law . . . and (b) having unlimited original jurisdiction in all cases except as may otherwise be provided by law." *Id.* at 18 (quoting Pa.Const. art. V, § 5) (emphasis omitted). It also points to 42 Pa.C.S.A. § 952, which states that "each division of the [Court of Common Pleas] is vested with the full jurisdiction of the whole court." *Id.* at 19 (quoting 42 Pa.C.S.A. § 952).

The Commonwealth thus argues that unless the law provides otherwise, the Court of Common Pleas has unlimited original jurisdiction, and "if a specialized assignment of jurisdiction to a particular division is unavailable in that division for whatever reasons, the result is not jurisdictional limbo; the result is unlimited original jurisdiction in the Court of Common Pleas." *Id.* at 18. As applied to juvenile matters, it maintains that Pennsylvania law does not "contemplate a scenario where an individual can age into a jurisdictional limbo beyond the reach of the Court of Common Pleas despite breaking the laws of the Commonwealth and victimizing another person." *Id.* at 21. It further argues that, if the statutes are unclear, they should be interpreted such that the General Assembly did not intend a result that is absurd, impossible, or unreasonable, and it contends adopting Taylor's argument would achieve such a result.

### 2. Case Law and Applicable Statutes

The parties discuss **Kent** and **Black**, where the United States Supreme Court and the United States Court of Appeals for the District of Columbia interpreted a Washington D.C. statute. In **Kent**, a juvenile court waived a

juvenile to adult court without a hearing and without counsel. The United States Supreme Court found that the waiver proceeding violated the juvenile defendant's constitutional rights and that the juvenile court's failure to decide the waiver question "in a valid manner cannot be said to be harmless error." 383 U.S. at 564. The Court then stated that it would "[o]rdinarily . . . reverse the Court of Appeals and direct the District Court to remand the case to the Juvenile Court for a new determination of waiver." *Id.* However, the Court noted that, because he had passed the age of 21, so that he no longer was a juvenile, the defendant argued that the juvenile court no longer had jurisdiction. The Supreme Court stated that "[i]n the circumstances of this case, and in light of the remedy which the Court of Appeals fashioned in *Black*, . . . we do not consider it appropriate to grant th[e] drastic relief." *Id.* at 564-65. Rather, the Court vacated the order and judgment and remanded "the case to the District Court for a hearing *de novo* on waiver." *Id.* at 565. If the District Court found waiver inappropriate, it would have to vacate the conviction. *Id.* However, if the waiver was proper, the court could proceed with further proceedings. *Id.*

In *Black*, which was decided shortly before *Kent*, the Court of Appeals for the District of Columbia noted that the Government had argued that the "impropriety in the waiver proceedings is not fatal since the District Court is authorized to exercise the powers of the Juvenile Court." 355 F.2d at 107 (citing D.C. Code § 11-914 (1961)). It argued the Code was a "safety valve." *Id.* There, the Court stated that the waiver question was one for the Juvenile

Court, which had "the facilities, personnel and expertise for a proper determination of the waiver issue." *Id.* It therefore ordered the District Court to remand to the Juvenile Court for a new determination of waiver. *Id.*[7] The opinion in *Black* does not state whether the defendant in that case was a juvenile at the time of remand.

In Pennsylvania, the Juvenile Act governs proceedings involving children. The Juvenile Act "shall apply exclusively to the following: (1) Proceedings in which a child is alleged to be delinquent or dependent. (2) Transfers under section 6322 (relating to transfer from criminal proceedings)." 42 Pa.C.S.A. § 6303(a)(1)-(2). A "child" under the Act includes: "An individual who: (1) is under the age of 18 years; [or] (2) is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years . . . .." 42 Pa.C.S.A. § 6302.

---

[7] It provided the following to assist courts in the disposition of juveniles who challenge their waivers without counsel:

> If the juvenile has not yet been brought to trial, the indictment should be held in abeyance pending remand to the Juvenile Court for redetermination of waiver; and if jurisdiction is retained by the Juvenile Court, the indictment should be dismissed. As to all others whose convictions have not become final, the procedure required in the present case should be followed. Since the Government is hereafter on notice of the juvenile's right to counsel upon waiver, any future indictments of juveniles denied this right should be dismissed.

*Black*, 355 F.2d at 108.

In **Commonwealth v. E.F.**, the defendant was arrested four months before his 21st birthday for acts he committed when he was between 12 and 14 years old. 995 A.2d 326, 327 (Pa. 2010). The juvenile court held a certification hearing and determined that the juvenile was amenable to treatment in juvenile court and therefore denied certification. **Id.** at 328. This Court reversed, concluding the denial of certification did not comport with the Juvenile Act.

The Pennsylvania Supreme Court concluded the juvenile court had not abused its discretion when denying certification. The Court concluded the case was not moot because the juvenile reached the age of majority. **Id.** at 332. Rather, "[t]he issue before [the Court] is not whether the trial court currently has jurisdiction to adjudicate [the j]uvenile delinquent; rather, the issue on appeal is whether the Superior Court erred by concluding that the trial court abused its discretion by denying the Commonwealth's certification petition." **Id.** The Court noted "[i]t is undisputed that [the j]uvenile was under the age of twenty-one when the trial court entered its order, and the fact that [the j]uvenile has passed the age of twenty-one during the pendency of the appeal does not render the instant case moot." **Id.** It reasoned that "[i]t is undeniable that [the j]uvenile will be affected by the outcome of this appeal, as our ruling will determine whether he is prosecuted for sexual assault in adult criminal court." **Id.** The Court concluded that the trial court acted within its discretion when it denied certification. **Id.** at 333. The Court then reversed the order the Superior Court and re-instated the order of the trial court denying the

Commonwealth's certification petition. *Id.* at 334. The Court did not address the steps the court should follow on remand, after re-instatement of the order denying the certification petition.

In *Johnson*, a juvenile was charged as an adult for murder. 669 A.2d at 317. Following a de-certification hearing, the trial court granted the de-certification motion and transferred the case to the juvenile division. *Id.* at 317-18. Johnson was adjudicated delinquent. *Id.* at 318. The Commonwealth appealed, challenging the transfer to the juvenile division. The Pennsylvania Supreme Court first addressed whether the transfer order was interlocutory such that the Commonwealth could not appeal until after the adjudication and disposition was final. *Id.* The Court noted that a challenge to an order transferring a case from the criminal division to the juvenile division would be asserted by the Commonwealth and therefore the juvenile would not waive a right to be free from double jeopardy, as he would if he challenged the order. *Id.* It noted that "if a transfer to the juvenile division is proper, then jurisdiction would vest with the juvenile division, jeopardy would attach at the initiation of the adjudicatory hearing, and subsequent criminal prosecution would be barred." *Id.* The Court noted that "[a] problem arises . . . when the transfer is improper. In those instances, the case should have remained in the criminal division and no action should have been taken by the juvenile division." *Id.* The Court noted such a scenario raised "questions of whether jurisdiction ever vested with the juvenile division and whether jeopardy attached with the adjudication by that division." *Id.* at 318-19; *see also id.*

at 319 (discussing **Commonwealth v. Greiner**, 388 A.2d 698 (Pa. 1978) (vacating judgment of sentence and remanding to juvenile division, where certification to criminal court was improper and criminal division "acted without authority to convict and sentence the juvenile")).[8]

The **Johnson** Court noted that Section 952 of the Judicial Code governs the divisions of the Court of Common Pleas[9] and provides:

> The divisions of a [C]ourt of [C]ommon [P]leas are administrative units composed of those judges of the court responsible for the transaction of specified classes of business of the court. In a [C]ourt of [C]ommon [P]leas having two or more divisions each division of the court is vested with the full jurisdiction of the whole court, but the

---

[8] The **Johnson** Court elaborated,

> [A] subsequent adjudicatory hearing would not have been barred, as the juvenile impliedly waived his claim to double jeopardy protection when he challenged the original conviction.

> Although a subsequent hearing would be permissible, such a hearing would seem to be unnecessary, as the criminal proceedings would have been more than sufficient to establish delinquency. It should be noted that the converse would not hold true. A juvenile adjudicatory hearing would not satisfy the standards required in a criminal proceeding; therefore, the juvenile would have to be retried, applying the more stringent rules of criminal procedure.

669 A.2d at 319 n.9.

[9] The Pennsylvania Constitution, Article V, Section 5 provides: "There shall be one [C]ourt of [C]ommon [P]leas for each judicial district (a) having such divisions and consisting of such number of judges as shall be provided by law, one of whom shall be the president judge; and (b) having unlimited original jurisdiction in all cases except as may otherwise be provided by law." Pa.Const. art. V, § 5.

> business of the court may be allocated among the divisions
> of the court by or pursuant to general rules.

*Id.* at 319 (quoting 42 Pa.C.S.A. § 952).

The ***Johnson*** Court rejected the argument the Commonwealth makes here, that is, that Section 952 means that every division of the Court of Common Pleas has jurisdiction to hear any matter that could be brought in the Court of Common Pleas. *Id.* at 320-21. The Court instead read Section 952 as granting "every division of the [C]ourt of [C]ommon [P]leas the jurisdiction to transfer any case properly heard in the [C]ourt of [C]ommon [P]leas to the proper division having subject matter jurisdiction over that particular matter." *Id.* at 320.

Important for our purposes here, it concluded that "the Juvenile Act is the type of legislation which exemplifies the legislature's desire to vest limited and **exclusive** jurisdiction in one division of the [C]ourt of [C]ommon [P]leas, in order to meet the special needs of our youth." *Id.* (emphasis added). The Court noted that it had previously found "the decision to transfer a case between the juvenile and criminal divisions is jurisdictional." *Id.*[10] The Court defined "jurisdiction" in the context at issue to mean "the power, right, or authority to interpret and apply the law" or "the limits or territory within which

_____

[10] **See Commonwealth v. Moyer**, 444 A.2d 101, 102 (Pa. 1982) (issue of certification is jurisdictional); **Greiner**, 388 A.2d at 702 (criminal court acted without authority in trying appellant as adult); **see also Commonwealth v. Leatherbury**, 568 A.2d 1313, 1315 (Pa.Super. 1990) (motion to transfer criminal proceedings to juvenile court presents jurisdictional issues); **Commonwealth v. Zoller**, 498 A.2d 436, 438 (Pa.Super. 1985) (motion for transfer was jurisdictional issue).

authority may be exercised." **Id.** at 321 (citation omitted). In then held that "the transfer order in question is jurisdictional in every sense of the term. Hence, if the challenged order is improper, jurisdiction does not vest with the receiving court." **Id.**

Alternately, a defendant who committed act as a juvenile, but is not charged until after achieving the age of 21, can be tried as an adult in the criminal court, "[a]bsent some improper motivation for the delay." **See Commonwealth v. Monaco**, 869 A.2d 1026, 1029-30 (Pa.Super. 2005); **see also Commonwealth v. Anderson**, 630 A.2d 47, 48-51 (Pa.Super 1993). In **Monaco**, the defendant was charged when he was 22 years old with crimes he allegedly committed when he was a juvenile. 869 A.2d at 1028. The Commonwealth initiated the charges approximately two months after receiving notice from the victims of the allegations. We concluded that, because there was no improper motivation, the defendant could be tried as an adult. **Id.** at 1030.

### 3. Proper Remedy

Here, we are constrained to conclude the only available remedy is discharge. When deciding the remedy available in **Kent**, the United States Supreme Court interpreted a Washington D.C. statute, and did not address what the proper remedy would be under Pennsylvania law.

In Pennsylvania, the juvenile division has exclusive jurisdiction to determine whether to transfer a matter to the criminal division. 42 Pa.C.S.A. § 6303(a); **Johnson**, 669 A.2d at 321. The juvenile division, however, no

longer has jurisdiction over Taylor, who is over the age of 21 and no longer a "child" under the Act. 42 Pa.C.S.A. §§ 6303(a); 6302. Further, because certification was not proper, the criminal court lacked jurisdiction to try Taylor. *See Johnson*, 669 A2d at 321; *Greiner*, 388 A.2d at 702. Although it could have done so, the General Assembly did not provide a mechanism for a court to have jurisdiction to hold a certification hearing where a certification determination was reversed on appeal, but a juvenile turned 21 during the appellate process. We do not have the authority to create such jurisdiction.

Further, the *Anderson*/*Monaco* exception cannot apply here, as the Commonwealth did not first institute charges after Taylor turned 21. The Commonwealth filed a delinquency petition while Taylor was a Child and when he remained subject to the Juvenile Act.

### III

In sum, we conclude that the constitutional error at issue in this case—a juvenile court's reliance on the defendant's refusal to admit guilt when deciding to certify the case to the trial court—is not amenable to harmless error analysis. We further conclude that, under Pennsylvania's legal framework, where a reversible error occurs at the certification hearing, and the defendant turns 21 before the appellate process is complete, dismissal is the only available remedy.

Judgment of sentence reversed. Case remanded. Jurisdiction relinquished.

Judge Musmanno joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/29/2021